**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AMICA MUTUAL INSURANCE CO. | : | |
|     *Plaintiff*, | | |
| | | |
| v. | : | CIVIL ACTION |
| | | NO. 18-1613 |
| ANITA DAS; SUNUNTA C. DAS; and, | | |
| INDRA J. DAS | : | |
|     *Defendants*. | | |

**MEMORANDUM**

**Jones, II  J.**                                                                                          **March 30, 2021**

**I.    Introduction**

Plaintiff Amica Mutual Insurance Company, an automobile insurance provider to Defendants Sununta C. Das, and Indra J. Das, commenced this action by filing a Complaint seeking Declaratory Judgment regarding Defendant Anita Das's status as a "resident relative" for purposes of underinsured motorist (UIM) coverage and benefits.

Presently before the court is Plaintiff's Motion for Summary Judgment. For the reasons set forth herein, Plaintiff's Motion shall be granted.

**II.   Background**

On September 11, 2016, Anita Das was struck by a motor vehicle while riding her bicycle in Philadelphia, Pennsylvania. (SUF ¶ 1.) At the time of the accident, Anita Das was enrolled as a graduate student at the University of Pennsylvania and was living at 5113 Hazel Avenue, Philadelphia, Pennsylvania. (SUF ¶¶ 6-7.)  Also at the time of the accident, Defendants Sununta C. Das and Indra J. Das had a Personal Auto Policy issued by Plaintiff Amica Mutual Insurance Company, policy number 97081320NM, with effective dates August 21, 2016 through August 21, 2017.  (SUF ¶ 2.)  The policy was issued to Sununta Das and Indra Das at 7915

Traders Hollow Lane, Indianapolis, Indiana. (SUF ¶ 3.)  Further, the auto policy Declarations Page included "the following household drivers:" Sununta C. Das and Indra J. Das.  (SUF ¶ 4.)  However, the policy provided underinsured motorist coverage for a family member who was also a "resident of [the insured's] household."  (SUF ¶ 5.)

**III.     Standard of Review**

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both: (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its

favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To that end, However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)) (internal quotation marks omitted). Instead, an affiant must set forth specific facts that reveal a genuine issue of material fact. *Id*.

A court must "view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003). However, if a party fails to properly address another party's assertion of fact, a court may consider the fact undisputed and grant summary judgment. *See* Fed. R. Civ. P. 56(e)(2)-(3).

**IV.   Discussion**

  **A. Choice of Law Analysis**

Because the instant matter is a diversity case, this Court must apply the choice of law rules of the forum state to determine what substantive law governs. *Foulke v. Dugan*, 187 F. Supp. 2d 253, 257 (E.D. Pa. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Here, Pennsylvania choice of law rules will govern because this Court is located in the state of Pennsylvania.  As for the substantive law which applies, Plaintiff maintains the law of the state where the insurance contract was issued controls, which is Indiana. (Pl.'s Mot. Summ. J. 9). Defendants claim that because there is no conflict between Pennsylvania law and

Indiana law, the laws of both states can be applied "interchangeably." (Defs.' Response Pl.'s Mot. Summ. J. 2.)

With respect to insurance contracts, Pennsylvania has long abandoned the "lexi loci delicti" rule "in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines Inc.,* 203 A.2d 796, 805 (1964). The *Griffith* rule allows district courts to determine which jurisdiction is most closely concerned with the outcome of the litigation. To that end, the *Griffith* approach requires Pennsylvania courts to "apply the law of the forum with the "most interest in the problem," rather than the law of the place of injury." *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 227 (3d Cir. 2007) (citing *Griffith*, 203 A.2d at 806.)

In applying the *Griffith* rule to a contractual issue, the court must first ascertain whether a "true conflict exists." *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.,* 609 F.3d 223, 230 (3d Cir. 2010) (quoting *Hammersmith,* 480 F.3d at 227)). If a conflict exists, "the court must then consider each state's contacts with the contract as set forth in the *Restatement (Second) of Conflict of Laws* and weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the relevant issue.'" *Travelers Prop. Cas. Co. of Am. v. Chubb Custom Ins. Co.*, 864 F. Supp. 2d 301, 308 (E.D. Pa. 2012) (citing *Specialty Surfaces,* 609 F.3d at 230).

In this case, the central issue is whether, at the time of the accident, Defendant Anita Das was a "resident relative" of Defendants Sununta Das and Indra Das at the Indiana home address. It is on this material fact that the parties disagree. Whether a true conflict of law exists depends on how Pennsylvania and Indiana respectively address ambiguities in insurance contracts in general, and how they might specifically define "resident relative." An "actual" conflict exists if

4

Pennsylvania and Indiana differ in their analysis of "resident relative," and "such difference will be a 'true' conflict if 'both jurisdictions' interests would be impaired by the application of the other's laws.'" *Travelers Prop. Cas. Co. of Am.*, 864 F. Supp. 2d at 308 (citing *Cipolla v. Shaposka,* 267 A.2d 854, 856 (Pa. 1970)).

### i. Pennsylvania Law

"[U]nder Pennsylvania law, the interpretation of an insurance contract is a question of law for the court to decide." *Courter v. Westfield Ins. Co*., CIVIL ACTION NO. 3:CV-13-2010, 2014 U.S. Dist. LEXIS 152556, at *17 (M.D. Pa. Oct. 28, 2014) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). Pennsylvania law requires that a court interpreting an insurance contract must give primary consideration to the "intent of the parties as manifested by the language of the written instrument." *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320–21 (3d Cir. 2011) (citing *Home Ins. Co. v. Law Offices of Jonathan DeYoung,* 32 F. Supp. 2d 219, 223 (E.D. Pa. 1998)). The policy is to be "read as a whole and construed according to the plain meaning of terms." *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir.1981). Words of common usage must be "construed in their natural, plain, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms." *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 495 (E.D. Pa. 2006). "When the language of an insurance policy is clear and unambiguous, a court is required to enforce that language." *Med. Protective Co. v. Watkins,* 198 F.3d 100, 103 (3d Cir.1999). Indeed, a court should "interpret the policy so as to avoid ambiguities and give effect to all of its provisions." *Little v. MGIC Indem. Corp.,* 836 F.2d 789, 793 (3d Cir.1987). Where there is more than one reasonable interpretation of the policy's terms, then the terms must be considered ambiguous. *C. H. Heist Caribe Corp.*, 640 F.2d at 481; *see also Aetna Cas. & Sur. Co. v. DeBruicker*, 838 F.

Supp. 215, 218 (E.D. Pa. 1993) ("In order to support a finding that there is an ambiguity, there must exist at least two reasonable interpretations of the contradicted term or clause."). Under Pennsylvania law, ambiguous provisions in insurance policies are construed against the insurer and in favor of the insured. "Any *reasonable interpretation* offered by the insured, therefore, must control." *Am. Auto. Ins. Co. v. Murray,* 658 F.3d 311, 320–21 (3d Cir. 2011) (quoting *Med. Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999)) (emphasis added).

With respect to assessing the term "resident" as it exists in an insurance policy, the Third Circuit has determined that "construction of the term 'resident' in [an insurance] policy is a matter of law." *Nationwide Mut. Ins. Co. v. Budd-Baldwin*, 947 F.2d 1098, 1100 (3d Cir. 1991) (citing *Myers v. State Farm Ins. Co.*, 842 F.2d 705, 708 (3d Cir.1988)). In *Budd-Baldwin*, the Third Circuit defined what it means to "regularly live" somewhere:

> "It is clear that to occupy a home means to be able to call that place one's own, to claim it as a place where one has a right to be. The word home itself connotes a place where one belongs and can always go with the certainty that he will be taken in. It connotes not only a physical place, i.e., the place where one eats meals, sleeps, socializes and generally spends time when not 'otherwise engaged with the activities of life,' but a sense of belonging. This definition clearly excludes persons who are mere visitors to the residence, however frequently they may visit and however certain they may be that they will always be taken in. Temporary visits, however frequent or regular, are simply insufficient to establish residency."

*Id*. at 1102 (emphasis added).

### ii. Indiana Law

Under Indiana Law, "[i]nterpretation of an insurance policy presents a question of law that is particularly suitable for summary judgment." *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. S. Ct. 2012). "When the language of an insurance policy is clear and unambiguous, Indiana courts give the words their 'plain and ordinary meaning.'" *Grimes v. State Farm Mut. Auto. Ins. Co.*, No. 1:18-CV-01039, 2019 U.S. Dist. LEXIS 207951, at *10 (quoting

6

*Briles v. Wausau Ins. Co.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006)). However, an ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning." *Id.* In such cases,

> [A]mbiguities in insurance policies are generally construed against the policy drafter, and an interpretation yielding coverage is favored. However, if no ambiguity exists, the policy will not be interpreted to provide greater coverage than the parties bargained for themselves. Additionally, policies will not be given an unreasonable interpretation in order to provide added coverage.

*Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1157 (7th Cir. 1993) (citing *Eli Lilly v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985); *Allstate Ins. Co. v. Neumann*, 435 N.E.2d 591, 594 (Ind. Ct. App. 1982)).

Indiana law requires the following factors to be considered by courts when determining residency status for the purposes of an automobile insurance policy: "(1) whether the claimant maintained a physical presence in the policy holder's home; (2) whether the claimant had a subjective intent to reside there; and (3) the nature of the claimant's access to the policy holder's home and its contents." *Grimes*, 2019 U.S. Dist. LEXIS 207951, at *11 (citing *Ind. Farmers Mut. Ins. Group v. Blaskie,* 727 N.E.2d 13, 15 (Ind. Ct. App. 2000)). Courts should also consider "all of the evidence indicative of the claimant's living habits." *Id.* "These factors should be considered in the context in which the term 'resident' is used and the purpose of the instrument in which the term is employed." *Id.*

### iii. *Griffith* Analysis

Applying the *Griffith* test, this Court finds there is no "true conflict" as to the interpretation of insurance contract under Pennsylvania law and Indiana law. Both states enforce the plain language of the contract, absent any ambiguities. When ambiguities exist, both states construe the ambiguities against the insurer—the drafting party—and favor interpretations that extend coverage to the insured.[1] Ostensibly, neither jurisdiction's interests would be impaired by the application of the other's laws. Therefore, there is no need to conduct an analysis of each state's contacts with the insurance contract and its interests in having its law applied to this case.

Moreover, "where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue." *Lucker Mfg., A Unit of Amclyde Engineered Prod., Inc. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994) (citing *In re Complaint of Bankers Trust Co.,* 752 F.2d 874, 882 (3d Cir.1984)). Because the outcome of this lawsuit will be the same under either Pennsylvania law or Indiana law, this Court may "interchangeably" refer to the laws of Pennsylvania and Indiana in discussing the law governing the definition of "resident relative." *Id.* at 813.

### B. Anita Das's Status as a "Resident Relative" at the Indiana Home Address

In this case, automobile insurance policy number 97081320NM, prepared by and provided by Plaintiff, extended UIM coverage to named policy holders and their "family

---

[11]  This Court recognizes that Indiana law provides for an assessment of intent (among other factors) in determining residency.  Pennsylvania law focuses more on the physical time spent at the residence.  However, Pennsylvania further provides for an assessment of "a sense of belonging"—where the person would "generally spend[] time when not 'otherwise engaged with the activities of life[.]'"  When considered in their entirety, this Court does not find these two standards necessarily inconsistent with one another, as an individual's intent is necessarily evidenced by the fact that they *choose* to be at a particular location "when not 'otherwise engaged with the activities of life[.]'"  *Budd-Baldwin*, 947 F.2d at 1102.

members," in addition to any other person occupying the covered automobile, or "any person for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described [above]." (Pl.'s Mot. Summ. J., Ex. A at 27.) The policy defines "Family Member" as "a person related to you by blood, marriage or adoption who is a resident of your household." (Pl.'s Mot. Summ. J., Ex. A at 12.) Plaintiff and Defendants disagree as to whether Anita Das was a qualifying "resident relative" under this policy at the time of her accident on September 11, 2016.

     As discussed above, under Pennsylvania law, there must be at least two reasonable interpretations of the term "resident relative" in order to constitute an ambiguity in the policy. Indiana law requires a similar standard for determining ambiguities. This Court finds there are at least two reasonable interpretations and therefore the term "resident relative" is ambiguous. First, as a modifier, "resident" may connote a qualifying relative who is physically present in the household address provided in an insurance policy. Second, "resident" may also apply to a qualifying relative whose permanent address is the household address in the insurance policy but may temporarily stay at other addresses. This second definition harkens back to the Third Circuit's statements about an individual having "sense of belonging" to that residence. *Budd-Baldwin* 947 F.2d at 1102.

     Plaintiff contends that because Anita Das spent time living away from the Indiana home address over the course of several years and because the accident occurred while Anita Das lived at an out-of-state address, she was not a "resident relative" during the relevant time period and is therefore not entitled to UIM coverage under the policy. Plaintiff notes that the Das family resided among three family homes in three different states. (Pl.'s Mot. Summ. J., Ex. B, Anita Das Dep. 11-15.) In particular, Plaintiff argues that because Anita Das has not lived with her

9

parents continuously since her high school graduation but instead, stayed in Philadelphia, Pennsylvania for her undergraduate studies and traveled often thereafter, she is not a "resident relative" for purposes of UIM coverage. (Pl.'s Mot. Summ. J. 15.) Lastly, Plaintiff contends that because Anita Das used her temporary Philadelphia address on student health insurance forms, she intended to abandon the Indiana home address.  (Pl.'s Mot. Summ. J. 15.) Defendants, on the other hand, maintain Anita Das's "residency" at the Indiana house is evidenced by the fact that: she kept many personal belongings at said house; had a driver's license from and was registered to vote in Indiana; and, there was "an expectation in her family and culture that she would continue to reside with her parents until she got married."  (Defs.' Resp. Mot. Summ. J. 5.) Defendants further claim Anita Das had been "essentially 100% financially-dependent on Mr. and Mrs. Das" while was a graduate student at the University of Pennsylvania and at the time of the accident. (Defs.' SUF ¶ 12, Ex. E 45:22-47:3.)  Sununta and Indra Das paid Anita's tuition and living expenses and provided her with a $4000.00 per month stipend. (Defs.' SUF ¶ 14, Ex. E 49:8-50:16.) Plaintiff does not dispute this fact. (Pl.'s Reply Defs.' SUF ¶ 14.)

In *Budd-Baldwin*, the Third Circuit defined what it means to "regularly live" somewhere. Further, the court distinguished the situation from "countless others in which persons stay temporarily at the home of another but have a more established connection with the household." *Id.* The court found that one such situation occurs with children of divorced parents, who have "a room to call his or her own in each residence, keeps clothes, books, games, etc. in each residence, and visits at the non-custodial parent's home at regularly scheduled intervals." *Id.* Said situation is distinguishable from the facts presented in *Budd-Baldwin* because the "the central purpose of the visit is to spend time with the parent." *Id.*

With respect to financial dependance, the court in *Aetna Casualty & Sur. Co. v. DeBruicker*, 838 F. Supp. 215 (E.D. Pa. 1993) determined that financial dependence alone is not sufficient to establish residency because otherwise "it would make residents out of a panoply of young people who are supported in their starting out years and older people who cannot pay their rent on fixed income." *DeBruicker*, 838 F. Supp. at 220. The *DeBruicker* court further noted:

> If physical fact is the controlling factor, clearly Lauren DeBruicker's presence is more often in California than in Pennsylvania. While her years before college constitute a relatively seamless status as a resident of her parent's home, and her years after college, should she own or rent a home of her own, are most likely uncontestable as "non-resident" years, the years in college defy such simple designation. While the filial relationship in this case is clearly a substantial one, nothing about it elevates Lauren DeBruicker's location status to an uncontested one of "resident."

*DeBruicker*, 838 F. Supp. at 220.

The *DeBruicker* court found it significant that an insured's daughter who was a full-time college student in her sophomore year and living on campus in California,[2] regularly chose to return home to Pennsylvania during extended breaks. *DeBruicker*, 838 F. Supp. at 219. This, coupled with the daughter's financial reliance on the insureds, led the court to construe the ambiguous term "resident relative" in favor of the insureds. However, in *Budd-Baldwin*, the Third Circuit held that a brother who frequently visited his sister's house was determined to *not* be a "resident relative" for the purposes of UIM coverage because he had moved out of the insured's Pennsylvania household three years prior to the accident, "lived in New Jersey five days a week, worked in New Jersey, owned a business there, and kept his personal belongings there." *Budd-Baldwin*, 947 F.2d 1098, 1103 (3d Cir. 1991). The brother's only connection with

---

[2] Notably, the daughter in *DeBruicker* was 18 years old at the time of her accident. In this case, Anita Das was 12 days shy of her 28th birthday at the time of her accident. (Pl.'s Mot. Summ. J., Ex. Das 3, ECF No. 27-2 at 43.)

his sister's residence was his near-weekly weekend stays in order to visit his fiancée, not his sister. *Id.* The brother would stay at his home in New Jersey for the weekend every four to six weeks. *Id.*

Anita Das's situation is distinguishable from that of the daughter in *DeBruicker* and more akin to the situation presented in *Budd-Baldwin*. Anita Das was well beyond her undergraduate college years when the accident in question occurred. Additionally, she traveled domestically and internationally for several years after college and prior to the accident for both work and pleasure, taking up various temporary accommodations, though keeping her address of record the Indiana home address. In particular, the record demonstrates as follows:

- The Das family moved to Pennsylvania when Anita Das was approximately 6 years old, originally renting a house in Montgomery County, and later moving to the Ambler house when Anita was 9 years old. (Anita Das Dep. 25:16-17, 27:1-7, Jan. 24, 2018.)

- While attending the University of Pennsylvania from 2005 to 2009, Anita Das mostly lived on campus and would go home to the Ambler house during the summers. (Anita Das Dep. 30:20-24, 31:1-24, 32:1-9.)

- Sununta and Indra Das moved to Indiana for Indra Das's job during the summer of 2009. (Anita Das Dep. 32:17-20.)

- Anita Das spent the summer of 2009 at the Indiana house. (Anita Das Dep. 33:7-9.)

- Anita Das lived with a friend in Philadelphia during the summer of 2010 and then moved to South Korea to teach until early 2011. (Anita Das Dep. 36:17-24; 38:4-16.)

- From South Korea, Anita Das moved to Thailand for approximately one year, through "mid 2012." (Anita Das Dep. 39:4-13.)

- From Thailand, Anita Das went to work at a summer camp in New Hampshire. (Anita Das Dep. 39:22-24.)

- Anita Das went to "see her parents, to spend time with them" in fall of 2012, at which time she switched her driver's license and voting address "to be in Indiana

12

*at my parents' residence*." (Anita Das Dep. 40:20-24, 41:1.) Although Anita Das said she did this because "my parents are my permanent residence[,]" she also said her Pennsylvania license was about to expire and since her parents were renting out their Ambler house, she switched the license to Indiana. (Anita Das Dep. 41:7-11, 43:15-24, 44:3-4.) However, Anita Das did not stay in Indiana— she elected to live in her brother's New York City apartment while he was away because it was "a free space." (Anita Das Dep. 44:3-9.)

- Anita Das went back to her parents' house for Christmas in 2012 and stayed for approximately two months to study for her GREs. (Anita Das Dep. 45:14-16.)

- After the GREs, Anita Das went back to Thailand, where she stayed until May 2013. (Anita Das Dep. 46:10-11, 47:2-16.)

- In May 2013, Anita Das went back to Indiana "to see my parents" because "they were going to pay for the flight . . . so I came back." (Anita Das Dep. 47:21-24.) She spent approximately three weeks in Indiana, at which time she took care of the visa she would need in order to begin a new job in Bangkok. (Anita Das Dep. 48:4-8.)

- Anita Das then moved to Bangkok to begin working in June 2013 and remained there for two years. (Anita Das Dep. 48:9-19.)

- In "mid 2015," Anita Das left Bangkok and returned to Indiana for "three weeks-ish[.]" (Anita Das Dep. 50:8-9.)

- In June 2015, Anita Das began a trip to Canada, Europe, and Asia. (Anita Das Dep. 50:8-11.)

- Anita Das was traveled internationally from July 2015 through approximately June 2016. (Anita Das Dep. 51:4-15.)

- After her one-year trip, Anita Das returned to Indiana to help Sununta Das pack up the house in order to move back to their home in Ambler, Pennsylvania. (Anita Das Dep. 53:18-24, 61:7-15.)

- Sununta Das told Anita to pack up her own stuff or she would throw it away, referring to "books and things [that] had been obviously *stored with my parents*." (Anita Das Dep. 61:13-18.)

- Prior to this time, Anita Das had left some of her belongings in the New York City apartment where her father has taken up residence. (Anita Das Dep. 63:1-7.)

- Approximately one month later, Anita Das returned to Canada for a month, traveled to Italy for approximately one week, and then returned to New York in

13

- mid-August 2016, before heading to Pennsylvania for graduate school. (Anita Das Dep. 64:3-15.)

- Upon beginning graduate school, Anita Das shared a house on Hazel Avenue in Philadelphia with three people she did not know. (Anita Das Dep. 65:23-24, 66:1-11.)

- Prior to beginning graduate school in August 2016, Anita Das provided the University of Pennsylvania with the family's Manhattan address as her permanent address. (Anita Das Dep. 90:23-24, 91:1-10.)

- After her accident on September 11, 2016, Anita Das moved into her parents' apartment in New York City, until she could return to school in Philadelphia in August of 2017. (Anita Das Dep. 78:22-24, 79:1-3.)

The policy at issue became effective August 21, 2016. Defendant Indra Das had been living in New York since March 2016. Defendant Sununta Das moved out of Indiana in August 2016—the month the policy at issue became effective.[3] These facts, taken together with those set forth immediately above, lead this Court to conclude that Plaintiff was not a "resident relative" at the time of the accident. The insureds themselves were not residing at the Indiana house on September 11, 2016. (Sununta Das Dep. 21:15-23.)

Defendants' contention that Anita Das: maintained an Indiana driver's license with the Indiana home address listed as her residence; was financially dependent on her parents; and, was always welcome to come back to the Indiana house, is not sufficient to establish she was a "resident relative." Anita Das had not spent a summer at the Indiana house since 2009. For the following seven years, Anita Das seemingly only visited the Indiana house when she needed to

---

[3] The record indicates that the Sununta and Indra Das contacted a realtor regarding the sale of the Indiana house in March 2016, when they learned Indra Das received a job offer in New York. (Sununta Das Dep. 23:9-17, July 25, 2019.) Indra Das began his job in New York on May 1, 2016. (Sununta Das Dep. 25:5-7.) At the time Sununta and Indra Das purchased the Amica Insurance Policy using the Indiana home address in 2016, they were in the process of selling said house. By the end of August 2016, they had already packed their belongings and moved them to their residences in Pennsylvania and New York.

take care of her own personal business, such as renewing her driver's license in Indiana before it expired so she would not have to take another licensing test, obtaining documentation needed in order to work overseas, preparing for graduate school exams, and retrieving items she had "stored" at the Indiana house while living elsewhere. (Anita Das Dep. 41:22-24, 42:1-3; 48:4-5; 61:13-18.) "Occasional, sporadic, and temporary contacts are insufficient" to establish residency to establish residency under Pennsylvania. *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431-32 (3d Cir. 1991). Anita Das was not a permanent resident of any one location but was a temporary resident of many.

## V. Conclusion

This Court concludes that ambiguity exists with respect to the term "resident relative" because it is susceptible to at least two reasonable interpretations. Applying the relevant factors for determining residency, the record clearly demonstrates Anita Das was not a resident of the Indiana house at the time of the accident. Accordingly, Plaintiff's Motion for Summary Judgment shall be granted.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II    J.